### LITTLE v. BARKER AND ANOTHER.

A. transferred 50 shares of stock to B., as security for the sum of $3,250, for which a note was given to B. On the same day B. transferred 35 of such shares to C., from whom $2,000 of the amount was obtained. No usury existed in this loan by C. to B. The balance, $1,250, was obtained from D., and usury was paid for it. B. was employed to get the money, and A. knew of his borrowing it of others, although the lenders' names were not communicated. B. also received a commission for obtaining the money, which was deducted from the sum paid over, and was usurious.

*Held*, that the transaction with C. was separate, and being free from usury, he was entitled to retain the 35 shares transferred to him as security, and to sell them, the time given by a power to sell having expired.

C. was repaid in part by money borrowed at legal interest from the complainant, and 15 of the shares were transferred to him. Held, that the plaintiff had the same right to retain and sell these shares as C. had.

Where stock is pledged, and no stipulation entered into as to the right to sell upon a default, the pledgee must give reasonable notice of a sale. But if it has been sold *bona fide*, without such notice, it seems it cannot be pursued into the hands of a *bona fide* holder, without notice of the pledge.

The plaintiff, in addition to the loan upon which the 15 shares was transferred, had got the residue of the stock transferred to him. He became the purchaser absolutely, the consideration being partly other loans untainted, and about $600 paid on the completion of the purchase.

*Held*, that the transaction was separable, and that as to so much of the stock as was transferred to the plaintiff, upon the loans he

was entitled to hold it, and as to shares, (20,) finally transferred when he became the purchaser, he was bound to surrender the certificates, and make an assignment.

Under the statute of 1837, *it seems* that a *bona fide* purchaser of stock or other property given as collateral security for an usurious loan, may be compelled to surrender it: And this even where the assignee of the stock is not the assignee of the debt.

THIS was a bill of interpleader. The court having determined that the bill was properly filed, and the complainants entitled to costs, the cause was argued as to the conflicting rights of the defendants.

*Mr. Emerson*, for defendant Barker.

*Mr. Bosworth*, for defendant Haddock.

THE ASSISTANT VICE-CHANCELLOR :—The defendant Barker, has had part of the stock in question transferred to him, and holds a certificate and power to transfer, for the residue. His right is contested on the ground of usury in the transaction through which he acquired it.

The chief effort of Barker's counsel has been to establish that the arrangement was a loan, through Thompson, as an agent; that there were two principals, Barker and Powers; that from the one was obtained the sum of $2,000, and from the other, $1,250. That as to the former there was no usury, although the loan of the latter was tainted with it. Thus, that the case is to be governed by the decisions in *Barretto* v. *Snowden*, (5 *Wendell*, 181,) and *Coster* v. *Dilworth*, (8 *Cowen*, 300.) A minute attention to dates and facts is requisite.

On the 7th of February, 1839, the fifty shares of stock in question, stood in the name of Haddock, and belonged to him. On that day he transferred the shares to Thompson, having received from him $3,250. He gave his note dated the 5th of February, for that amount, payable in 30 days with interest, and expressing, " that he had deposited " with him, Thompson, as collateral security, (with autho-

"rity to sell the same, on the non-performance of this "promise,) fifty shares of the capital stock of the Staten "Island Bank."

This note fell due the 8th of March. On the 7th of February, 1839, thirty-five of these shares were transferred by Thompson to Francis Marvin, and Thompson positively swears, that he got $2000 of the $3250, from Marvin, on that day, and paid it over to Haddock. (Folio 16.) He does not think that he told Haddock that the money came from Marvin. He borrowed it from Marvin for the same period as exhibit, No. 1, had to run, viz., thirty days. He also states, that when it became due he borrowed the amount of other persons to pay Marvin, and paid him the $2000 with lawful interest. Thompson swears that when he paid Haddock the money, he told him he had to borrow it, although he does not think he told him he had got it from Marvin.

There was certainly no usury in the transaction between Marvin and Thompson. The balance of the advance, for which the note of $3250 was given, was received from Powers. It appears that Haddock applied to Thompson, who was either to loan or to procure a loan of the $3250 for him, and that he charged him two per cent. as a commission for obtaining the money. He paid him the $3250, less the two per cent. The evidence of Powers confirms this statement, showing that $65 was received by Thompson, which is two per cent., and I conclude that this was in addition to the interest, as the note is drawn with interest. Powers introduced Haddock to Thompson, and was to receive one per cent. for this act, if the loan was procured. He states that he received it, but that he accounted to Haddock for one half, as he did not get the loan for 60 days.

The $1250 was obtained from Powers. He received one per cent. on the whole, or $65. Assuming that he actually returned one half, he got $32 50 for the loan of $1250. In point of fact he never repaid it, but charged it as a compensation for obtaining a renewal of the note.

I gather from all the circumstances that the deduction

of two per cent. was divided between Powers and Thompson ; and so far as Powers' advance is concerned there is manifest usury. Powers states that Haddock applied to him either to loan the money or to introduce him to a broker who could procure it. Thompson was a broker.

I consider that this case, so far as Marvin was concerned, is covered by the principle settled in *Barretto* v. *Snowden*. The note was in that case given to Corp who had negotiated the loan, and had deducted $500 by agreement from the $4000. But the money had been actually advanced by Hoyt and another, and they received no more than legal interest. The fact that here one of the two lenders got a usurious rate of interest, for his part of the sum loaned cannot make a difference, where, as in this case, Marvin held a separate security, viz: the 35 shares for his part of the advance. Before that could be taken out of his power he must be found chargeable with usury in his own part of the transaction.

When Marvin was repaid, $1000 was borrowed of George R. Barker for that purpose. The loan from him was for fifteen days. The residue was obtained from Lyman Sandford. Then the note marked exhibit No. 2, dated March 12, 1839, for $3250 was given. This contained the same power to sell as the preceding note.

The $1000 was borrowed, Thompson says, as agent of Haddock. There was no agreement as to what sum was to be paid for it. He also swears that he believes that in repaying Barker he paid no more than 7 per cent. interest. That sometimes he may have taken uncurrent money from him in loans to repay current, but in no other instance has he had over 7 per cent. He adds that he charged Haddock a commission somewhere about eighty dollars for this negotiation.

When the $1000 was borrowed of Barker, 15 shares of stock were transferred to him as security, and it appears that this was part of Marvin's stock. Thompson says he told Haddock he had to borrow money to repay Marvin. The 15 shares do not seem to have been transferred until the 29th of March.

So far then, and as to these fifteen shares, there is no ground for imputing usury to any transaction to which Barker was a party, or in the least degree connected with. Haddock was apprized that his broker, Thompson, had to borrow the money. Marvin was the lender of $2000, without usury, and got a distinct security. Barker loaned $1000 without usury, and received a part of this security. The whole must be treated as if Haddock had personally applied to Marvin for $2000, and subsequently to Barker to repay Marvin.

As to the money which came from Sandford, it appears, that Thompson first borrowed temporarily $1000 to pay Marvin, and afterwards got $1000 from Sandford. This was secured by a transfer of twenty shares of the stock, and the transfer appears to have been made on the 14th of March, as attorney of Thompson. Thompson expressly denies that there was any illegal interest charged upon this loan by Sandford. The fact that Sandford was able to get some costs paid which Thompson owed him cannot affect the transaction. When Sandford was to be paid, which it seems must have been about the first of April, an extension was obtained, and ultimately part of the money to pay him was borrowed of David Howe, with whom a certificate for the 20 shares was deposited, with a power of attorney. The other part of the money he says he got from Barker. He thinks he got $700 from Howe; the balance of course was $300.

It also appears that on the 2d of April, five shares of the stock were transferred by Thompson to Barker. The stock was valued at $65 a share.

It cannot admit of doubt that Barker obtained these 20 shares as a valid security for his loan of about $1300. There is no shadow of imputation upon his dealings in this transaction.

Then we find the certificate for 20 shares which was given to Howe, delivered on the 7th of May to Barker. Thompson says that he sold Barker this parcel of stock, as well as that before held by him, he assuming to pay Howe and get the stock out of his hands. No usury is

made out in the borrowing from Howe. We find then that Barker on the 1st and 2d of April, was lender of about $1300, and assumed to pay Howe $700, which it must be concluded was paid, as by the 7th of May the certificate appears in his hands. This all amounts to about $2000; and Thompson swears that the amount given by Barker upon the sale of the stock was about $2,600. These details confirm the accuracy of his general statement, that Barker paid the balance after deducting the $1000 which he had borrowed on the stock, and paying Howe his amount, and taking the stock of him, and also deducting some more borrowed money which he, Thompson, had got in order to take the stock out of Sandford's hands. He adds that the balance paid was something over $600.

From this review of the facts of the case, I take it to be perfectly clear that if Barker had only advanced Howe the $700 he would have had a right to hold the stock as security for all he had advanced, viz : for about $2000 : that it never could have been reclaimed by Haddock without paying this amount justly and fairly due.

But the question of sale is different, and not so easy of determination. I shall assume that Barker paid $600 more in cash than he loaned, or agreed to pay of a *bona fide* loan. And the sale was effected, Thompson says, about the 1st of May, 1839. I have already stated the terms of the notes of February 6th and March 12th, 1839, containing a power to sell the stock. But on the 1st of April, 1829, the following receipt is given by Thompson : " Received, New-York, April 1st, 1839, of C. C. Haddock, " 40 shares of the stock, &c., as collateral security for the " $2,000, the amount of his note dated this day, which I " agree to convey on the prompt payment of the same."

The note stated as having been given is not exhibited. Perhaps none was actually made. But the receipt, being without the power to sell, appears to make a new contract ; and that is, to re-convey the stock upon the prompt payment of the debt. The question was made whether under

such a contract, a sale can be made without giving notice to the pledger of the stock.

The law of the court I take to be this; that the pledger may call upon the mortgagee to replace the stock where no notice has been given of the sale, offering to pay the amount due. But the case is very different where the stock is in the hands of a purchaser without notice. I hold that it cannot be pursued into a purchasers hands without the clearest proof of personal knowledge of the loan and pledge. I do not think, however, that in this case the point is material, as my decision turns upon other principles.

The original note of $3250 was void as between Thompson and Haddock. The transfer of the stock was void, and could have been reclaimed as between them. On the 1st of April, $1250 is endorsed on the note of the 12th of March, as paid. And the receipt of that date speaks of a new note. Probably the old note with the endorsement was retained as sufficient. But this would be immaterial. The part payment, and taking a new note could not purge the usury in the transaction. Then suppose there had been a direct sale of this stock by Thompson to Barker on the 15th of April, for the sum of $2,600; that there had been no previous loan or advance by the latter, and no previous transfer for his security.

Prior to the Revised Statutes this court would not have interfered, and decreed the surrender of an usurious security without payment of the amount lawfully due. And even at law an action of trover would not be sustained for recovery of property deposited as collateral security, but upon the same terms. (*Fitzroy* v. *Guillim*, 1 *T. R.* 183.) The security, however, could be reached upon these conditions, although it was in the hands of a *bona fide* purchaser.

The Revised Statutes recognized the invalidity of all such securities except notes and bills, although in the hands of a *bona fide* holder, when it expressly made an exception in favor of holders of notes and bills. (1 *R. S.* 775, § 5.) The judicial construction of that statute still

justified this court in requiring payment of the *principal* sum upon a bill of discovery, as well as in a large class of cases where relief was sought against a judgment. (*Livingston* v. *Harris*, 3 *Paige*, 528.   11 *Wendell*, 329.) But the act of 1837, (chapter 430,) has abolished the necessity of doing this in any case, and has recognized in the most explicit language the power of the court, and made it its duty, to decree the surrender of every security and every article of property, connected with a usurious contract. (Section 5.)

In *Brighton* v. *Brace*, (20 *Wendell*, 334,) where there had been a deposite of collateral notes upon a usurious contract, and replevin was brought for them, the court say, that the agreement under which they were delivered was not binding, and hence the plaintiff had a right to repudiate it ; and (as is to be inferred) had a right to sustain the suit, had the demand been properly made before action, the want of which demand defeated it.

I do not find in the statute any thing justifying the court in protecting the *bona fide* purchaser of a collateral security given on a usurious loan.   Under the old statute it was held that such a purchaser at a sale made by virtue of a power contained in a mortgage tainted with usury, was protected.   But the terms of the act authorizing such a sale was much relied upon.   (*Jackson* v. *Henry*, 10 *Johns. Rep.* 185.)   The revisers, as part of their system, provided for an assignee and purchaser obtaining the sum or value actually loaned.   (Proposed 5th section.)   But these provisions were rejected, and under the statute of 1830, I apprehend that even where a transfer of stock accompanies a promissory note as security, the assignee of the stock, not being the assignee of the note, can be compelled to surrender it.   It is true he would have had the rights which the lender himself had under the eighth section of the act, as expounded in *Livingston* v. *Harris.* Those rights being taken away by the act of 1837, I apprehend that the purchaser in good faith of stock or property, deposited on a usurious transaction, can be compelled to deliver it without receiving any thing.

Admitting my regret at finding the law to be thus established, I have still to enforce it. If Barker then appeared solely as the purchaser of the stock, I would have been compelled to decree its return, even without payment of the principal and interest actually advanced either by Thompson originally, or by Barker on such purchase.

But I think this court has the power, (and if so I shall gladly avail myself of it,) to separate this transaction, and to preserve and establish that part of it which was legal. Barker, before his purchase was effected, had advanced the sum of $1300, for which he held twenty of these shares. The transaction, as before observed, was untainted with usury on his part, and as Haddock knew that Thompson was borrowing money, the case is to be treated in the same manner as if the negotiation for the money loaned by Barker had taken place between him and Haddock directly. But when Barker buys the shares absolutely, and gets twenty shares more in payment of his prior advance, and in consideration of a further sum then paid, he acquires a right under Thompson, and can have no better right than Thompson himself had. He is affected by what would have affected Thompson as to all the stock which he had not previously acquired by a legal transaction.

Keeping in view then, that the true relation between Thompson and Barker was that of borrower and lender, Barker held twenty shares as security, for about the sum of $1300, freed from all illegality. And he had a right to require payment of that amount, before he re-transferred the stock. He then gets the other twenty shares, but acquires them under such circumstances as to make him subject to the same claim that Thompson was subject to.

It has occurred to me, whether I could establish a lien upon the other twenty shares, for the amount of $700 loaned by Howe, and as to which there was no usury. But upon reflection, I do not think it can be sustained. Barker does not go and deal with Howe, and place himself merely in his situation as a fair lender of money. But he purchases the stock of Thompson, relinquishing his claim

for prior advances, paying a further sum, and assuming to pay Howe, which was not done for several days afterwards. The utmost that can be done, is to permit him to hold his original twenty shares as security for this seven hundred dollars, as well as the thirteen hundred.

The decree will be, in. substance, that the defendant Barker is entitled to hold the 15 shares of the stock transferred on the 29th of March, 1839, and the five shares transferred on the 2d day of April, 1839, as security for the sum of $2000, that the defendant Haddock may redeem such stock by payment of that amount, if paid within ten days from the entry of this decree; otherwise, that the defendant Haddock be perpetually enjoined from interfering with the right of Barker, to transfer and dispose of such stock, and that the complainant's thereafter permit any transfer or disposition of such shares to be made by the said Barker.

That the defendant Barker, surrender to the defendant Haddock, the certificate for 20 shares of such stock transferred to him by Howe, on or about the 7th day of May, 1839, and be enjoined from claiming any right or interest in the same, or prosecuting any suit therefor or thereupon. And that the complainant permit a transfer and disposition by the said defendant Haddock, of such shares.

Each party to pay his own costs.